UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 14-20195-CR-Cooke

UNITED STATES OF AMERICA,

vs.

MERCATOR SHIP MANAGEMENT, S.A.,

Defendant.

FILED by _____ D.C.

APR 30 2014

STEVEN M. LARIMORE
CLERK U. S. DIST. CT.
S. D. of FLA. – MIAMI

## PLEA AGREEMENT

The United States of America and **MERCATOR SHIP MANAGEMENT, S.A.,** (hereinafter referred to as the "defendant"), enter into the following agreement:

A.    **FACTUAL PROFFER**

1.    The defendant and the United States agree that the United States could prove the following facts beyond a reasonable doubt:

a.    The Motor Vessel *(M/V) Caribbean Jade* is a 329-foot, 4028-ton cargo vessel that is registered in Antigua. *The M/V Caribbean Jade* is registered in Antigua under International Maritime Organization Number 9160504. *The M/V Caribbean Jade* typically engages in voyages from Miami, Florida to islands in the Caribbean.

b.    Defendant is the Operator of the M/V Caribbean Jade and other ocean going cargo vessels with a principal place of business of 3201 NW 24th Street, Miami, Florida. At all relevant times, Defendant technically managed the *M/V Caribbean Jade.* Defendant also technically manages the *M/V Nera II (IMO #8502365), M/V El Rama (IMO #8404288), and M/V Carib Ocean (IMO #9212448).*

Page 1

c.      The United States is party to an international regime that regulates the discharge of oil from vessels at sea: the International Convention for the Prevention from Pollution from Ships, as modified by the Protocol of 1978, also known as "MARPOL." MARPOL is embodied in numerous international agreements that the United States has ratified, and has been legislatively implemented in the United States by the Act to Prevent Pollution from Ships ("APPS"), 33 U.S.C. §§ 1901 *et seq.* APPS makes it a crime for any person to knowingly violate MARPOL, APPS, or regulations promulgated under APPS. 33 U.S.C. §1908(a). These regulations apply to the *M/V Caribbean Jade.*

d.      On or about December 26, 2011, the *M/V Caribbean Jade* departed Philipsburg, St. Maarten en route to Miami, Florida, and arrived at the Port of Miami on December 31, 2011. The *M/V Caribbean Jade* had an Engine Department headed by a Chief Engineer, assisted by a Second Engineer. The Engineers were assisted by another crew member referred to in the industry as an "Oiler." The Chief Engineer had overall responsibility for the operations of the Engine Department, including the supervision of daily operations, formulation and implementation of Engine Department procedures, and verification that all systems, including a pollution prevention control device known as an Oil Water Separator, were functioning properly.

e.      The operation of marine vessels like the *M/V Caribbean Jade* generate quantities of oily sludge and oily waste water. Oily sludge is generated during the process of purifying fuel oil, lubricating oil, and other petroleum products so that these products can be used in the engines on board the vessel. The oily sludge generated as a result of this process must be stored on board the vessel in sludge tanks until it is either burned on board the vessel through the use of an incinerator or auxiliary boiler or offloaded onto shore-side facilities for disposal. Engine department operations generate quantities of waste oil due to leaks and drips from this



purification process and the engines' lubrication and fuel systems. This waste oil combines with water, detergents, solvents, and other wastes that accumulate in the bottom or the "bilges" of the vessel to form oily waste water.

f.      This oil contaminated bilge waste must be collected, stored and then processed to separate the water from the oil and other wastes using the Oil Water Separator. After passing through the Oil Water Separator, engineering space oily waste water containing less than fifteen (15) parts per million of oil may be discharged overboard.

g.      At all relevant times, the engine spaces of the *M/V Caribbean Jade* were configured so that the ship's bilge water could be transferred through a series of pipes and valves from holding tanks to the vessel's Oil Water Separator. When processed through the Oil Water Separator, fluid with an oil content below 15 parts per million could be discharged into the ocean.

h.      On or about December 26, 2012, while the vessel was at sea en route to Miami, Florida, the Chief Engineer of the *M/V Caribbean Jade* directed the Oiler to bypass the Oil Water Separator to discharge oil contaminated bilge water from the bilge well in the main engine room directly overboard. The Oiler bypassed the Oil Water Separator as directed, by disassembling a hard pipe connection from the Oil Water Separator, and connecting a temporary line from the discharge side of the bilge transfer pump to the Oil Water Separator overboard valve. The Oiler and Chief Engineer then pumped bilge water directly overboard. When the vessel arrived at the Port of Miami on December 31, 2011, no entry had been made in the Oil Record Book for the discharge of bilge water that occurred on December 26, 2011.

i.      During their inspection of the vessel, Coast Guard personnel recovered a receipt for a vessel to shore transfer of 3,355 gallons of bilge water and oily sludge. The numerical entry for the amount of bilge and oily sludge purportedly transferred from the vessel had been altered. A

Page 3



copy retained by the company hired to pump the bilge and sludge from the vessel revealed that only 2,500 gallons had been pumped from the vessel. The Chief Engineer at the time acknowledged that he altered the number on the receipt maintained by the vessel.

        j.      The Coast Guard inspectors also examined the *M/V Caribbean Jade's* Oil Record Book. The Oil Record Book did not contain any entries reflecting the overboard discharge of bilge in December 2012. The Oil Record Book also contained a materially false entry on April 20, 2012, consistent with the falsified receipt for the vessel to shore transfer that took place the day before, which inflated the amount of bilge and oily sludge transferred from the vessel on April 19, 2012.

**B.**       **<u>TERMS OF THE AGREEMENT</u>**

2.      The defendant agrees to plead guilty to the Information, which charges the defendant with two counts of failure to maintain an accurate Oil Record Book, in violation of 33 U.S.C. § 1908(a). The elements of this offense are:

        a.      That the *M/V Caribbean Jade* was a ship, other than an oil tanker, of 400 gross tons or more,

        b.      That the Defendant's employees failed to maintain an accurate Oil Record Book,

        c.      That this failure to maintain an accurate Oil Record Book occurred at a port or place of the United States;

        d.      That the Defendant's employees acted knowingly;

        e.      That each of the acts committed by the employee of the corporation were within the course and scope of the employment or agency given to the employee by the Defendant, and

        f.      That the employee of the Defendant committed each of the essential elements of the



offense, motivated at least in part, by an intent on the part of the employee to benefit the Defendant.

3.      The defendant understands and acknowledges that the Court may impose a term of probation of not less than one year and not more than five years for the two counts of the information. The United States and the defendant agree that, although not binding on the court, they will jointly recommend that defendant receive a sentence of probation of five (5) years, with the period of probation being reduced to three (3) years in the event the entire fine amount is paid in full by that time.

4.      The parties agree, although not binding on the court, they will jointly recommend the following special conditions of probation:

        a.      That the defendant complies with the Environmental Compliance Plan ("ECP") that is contained in Attachment A to this Plea Agreement. The defendant understands and agrees that the ECP shall apply to the four subject vessels listed in the ECP. The ECP will be binding on the *M/V Caribbean Jade (IMO #9160504), M/V Nera II (IMO #802365), M/V El Rama (IMO #8404288) and M/V Carib Ocean (IMO #9212448),* so long as these vessels are owned or operated by the defendant, or remain under the ownership, operation, or technical management of the defendant or its principals. If any of the vessels is sold to a third party as a result of an arm's length transaction and the defendant no longer oversees their operation or technical management, that vessel will be relieved from the ECP.

        b.      The defendant understands and agrees that the ECP shall last until the earlier of 1) the defendant's satisfactory implementation of an Environmental Management System (EMS) pursuant to Section F of the ECP, 2) the end of the defendant's period of probation, or 3) the sale of the vessels to a third party and termination of the defendant's

technical management of the vessel. The defendant further agrees and understands that, in addition to seeking revocation or modification of the defendant's probation pursuant to 18 U.S.C. §3565, the Office of the United States Attorney for the Southern District of Florida (hereinafter "Office") reserves the right to prosecute the defendant if it fails to complete the ECP for any of the vessels listed.

5.     In addition to a term of probation, the court may impose a fine of up to $500,000, or twice the gross gain or loss per count. The parties agree, although not binding on the Court, that they will jointly recommend a fine of $600,000 for both counts of the Information, payable as more fully set forth below.

6.     The parties agree to jointly recommend payments of the fine to be made in the following installments: (1) $100,000 to be paid at the time of Sentencing; (2) $400,000 will be paid in quarterly installments of $25,000 each starting ten (10) months after the initial $100,000 payment at Sentencing; (3) the final $100,000 will be paid 6 months after the final quarterly installment. Upon payment of the initial fine installment of $100,000, or placement of said amount into a mutually agreed escrow account, at defendant's option, the Customs Hold placed on the M/V CARIBBEAN JADE will be immediately released.



7.      The defendant is aware and understands that the court is permitted to tailor the ultimate sentence in light of other statutory concerns. Knowing this, the defendant understands and acknowledges that the court has the authority to impose any sentence within and up to the statutory maximum authorized by law for the offense identified in paragraph 2 above, and that neither party may withdraw the plea solely as a result of the sentence imposed.

8.      The defendant further understands and acknowledges that, in addition to any sentence imposed under paragraphs 3 and 5 of this agreement, a special assessment in the amount of $400 will be imposed on the defendant for each count of conviction. The defendant agrees that any special assessment imposed shall be paid at the time of sentencing.

9.      The Office of the United States Attorney for the Southern District of Florida (hereinafter "Office") reserves the right to inform the court and the probation office of all facts pertinent to the sentencing process, including all relevant information concerning the offenses committed, whether charged or not, as well as concerning the defendant and the defendant's background.  Subject only to the express terms of any agreed-upon sentencing recommendations contained in this agreement, this Office further reserves the right to make any recommendation as to the quality and quantity of punishment.

10.     The defendant is aware that the sentence has not yet been determined by the court. The defendant also is aware that any estimate of the probable sentencing range or sentence that the defendant may receive, whether that estimate comes from the defendant's attorney, the government, or the probation office, is a prediction, not a promise, and is not binding on the government, the probation office or the court. The defendant understands further that any recommendation that the government makes to the court as to sentencing, whether pursuant to this agreement or otherwise,



is not binding on the court and the court may disregard the recommendation in its entirety.

11.     The defendant agrees that it will provide to the United States written evidence in the form of a certified resolution by the Board of Directors, certifying that the defendant is authorized to plead guilty to the charges as set forth in the Information, and to enter into and comply with all provisions of this agreement. The resolution shall further certify that the designated corporate representative, is authorized to take these actions and that all corporate formalities required for such authorization have been observed. The defendant agrees to have the designated representative act on its behalf in these criminal proceedings, appear on the defendant's behalf to enter the guilty plea, and to appear for the imposition of sentence.

12.     In the event the defendant withdraws from this agreement prior to or after pleading guilty to the charges identified in paragraph two (2) above, or otherwise fails to fully comply with any of the terms of this plea agreement, this Office will be released from its obligations under this agreement, and the defendant agrees and understands that prior to sentencing the defendant thereby waives any protection afforded by any proffer letter agreements between the parties, Section 1B1.8 of the Sentencing Guidelines, Rule 11(f) of the Federal Rules of Criminal Procedure, and Rule 410 of the Federal Rules of Evidence, and that the facts set forth in paragraphs 1(a) through and including 1(k) will be admissible against the defendant without any limitation in any civil or criminal proceeding brought by the government. The defendant stipulates to the admissibility, in any case brought by the United States in any way related to the facts in this agreement, of the entire factual basis set forth in paragraphs 1(a) through and including 1(k) as being the defendant's own statement. The defendant voluntarily and knowingly adopts this factual basis as a post-plea, prior to sentencing, discussion statement that is not protected by Federal Rule of Criminal Procedure 11(6) or Federal Rule of Evidence 410.



13.     The defendant is aware that Title 18, United States Code, Section 3742 affords the defendant the right to appeal the sentence imposed in this case. Acknowledging this, in exchange for the undertakings made by the United States in this plea agreement, the defendant hereby waives all rights conferred by Section 3742 to appeal any sentence imposed or to appeal the manner in which the sentence was imposed, unless the sentence exceeds the maximum permitted by statute or is the result of an upward departure from the guideline range that the court establishes at sentencing. The defendant further understands that nothing in this agreement shall affect the government's right and/or duty to appeal as set forth in Title 18, United States Code, Section 3742(b).

14.     However, if the United States appeals the defendant's sentence pursuant to Section 3742(b), the defendant shall be released from the above waiver of appellate rights. By signing this agreement, the defendant acknowledges that it has discussed the appeal waiver set forth in this agreement with his attorney.  The defendant further agrees, together with the United States, to request that the district court enter a specific finding that the defendant's waiver of its right to appeal the conviction or sentence to be imposed in this case was knowing and voluntary.

15.     This is the entire agreement and understanding between the United States and the defendant. There  are no other agreements, promises, representations, or understandings unless contained in



a letter from the United States Attorney's Office executed by all parties and counsel prior to the change of plea.

WIFREDO A. FERRER
UNITED STATES ATTORNEY
SOUTHERN DISTRICT OF FLORIDA

Date: 2/28/14                          By: _____
                                       ALEJANDRO O. SOTO
                                       ASSISTANT UNITED STATES ATTORNEY

Date: 4/9/14                           By: _____
                                       MICHAEL CHALOS
                                       COUNSEL FOR DEFENDANT
                                       MERCATOR SHIP MANAGEMENT, S.A.,

Date: 4/8/14                           By: _____
                                       MERCATOR SHIP MANAGEMENT, S.A.,
                                       DEFENDANT